## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**PAUL F. WEINBAUM,**
**OLIVIA S. WEINBAUM,**
**MARTIN J. BOYD,**

       **Plaintiffs,**

**vs.**                                                 **No. CIV 05-0996 RB/LAM**

**CITY OF LAS CRUCES, NEW MEXICO,**
**WILLIAM MATTIACE, individually,**
**and in his official capacity as Mayor of the**
**City of Las Cruces, DOLORES ARCHULETA,**
**individually, and in her capacity as a member**
**of the City Council of the City of Las Cruces,**
**New Mexico, DOLORES CONNOR,**
**individually, and in her capacity as a member**
**of the City Council of the City of Las Cruces,**
**New Mexico, JOSE FRIETZE, individually,**
**and in his capacity as a member of the City**
**Council of the City of Las Cruces, New Mexico,**
**KENNETH MIYAGASHIMA, individually, and**
**in his capacity as a member of the City Council of**
**the City of Las Cruces, New Mexico, WESLEY**
**STRAIN, individually, and in his capacity as a member**
**of the City Council of the City of Las Cruces, New**
**Mexico, and STEVE TROWBRIDGE, individually,**
**and in his capacity as a member of the City Council**
**of the City of Las Cruces, New Mexico,**

       **Defendants.**

### MEMORANDUM OPINION AND ORDER

       **THIS MATTER** came before the Court on Cross Motions for Summary Judgment (Docs.

140 and 142), filed on June 29, 2006.  Jurisdiction arises under 28 U.S.C. §1331 (2000).

       Having reviewed the submissions of the parties, and being otherwise fully advised, I grant

Defendants' motion and deny Plaintiffs' motion.

## I. Background.

Plaintiffs[1] allege that the adoption of the official symbol by the City of Las Cruces, New

Mexico ("Symbol") violates the First Amendment of the United States Constitution.  U.S. Const.

amend. I.  The Symbol consists of three crosses surrounded by a sunburst:



The City of Las Cruces ("the City") displays the Symbol prominently on public property,

(Affidavits of Paul F. Weinbaum and Martin Boyd, M.D., Exs. 1-28), and uses the Symbol on official

documents.  (*Id*.)

Plaintiffs contend that the City's extensive use of the Symbol pervades the daily lives of city

residents, including Plaintiffs.  They allege that the City's creation and use of the Symbol is an

endorsement and advancement of religion in violation of the Establishment Clause of the First

---

[1] Plaintiffs are residents of the Las Cruces area.  Olivia Weinbaum is the unemancipated minor daughter of Paul Weinbaum.  In order for this Court to exercise jurisdiction under Article III, Plaintiffs must allege, and ultimately prove, that they have standing.  *See Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006). Allegations of personal contact with a state-sponsored image suffice to establish standing in a First Amendment case.  *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1223 (10th Cir. 2005) (citing *Foremaster v. City of St. George*, 882 F.2d 1485, 1490-91 (10th Cir. 1989)).  Plaintiffs Paul Weinbaum and Martin Boyd aver that they are "constantly forced to view the Las Cruces symbol."  (Pls. Exs. 1 & 2.)  Plaintiffs Paul Weinbaum and Martin Boyd may also have standing as municipal taxpayers.  *See Flast v. Cohen*, 392 U.S. 83 (1968); *Women's Emergency Network v. Bush*, 323 F.3d 937, 943 (11th Cir. 2003); *Freedom from Religion v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988).  However, the record contains no allegations that confer standing on Olivia Weinbaum.  Moreover, as an unemancipated minor, Olivia Weinbaum lacks the legal capacity to sue on her own behalf.  *See* Fed. R. Civ. P. 17(c); 6A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 1570 (2006).  For these reasons, the claims of Olivia Weinbaum are dismissed without prejudice.

Amendment.  Further, they claim that the City's creation and use of the Symbol has the effect of advancing religion and fostering excessive governmental entanglement with religion.  Plaintiffs brought suit under 42 U.S.C. § 1983 (2000), seeking a declaratory judgment, a permanent injunction, damages, as well as attorney and expert witness fees.

The question presented to the Court is whether, in Las Cruces, New Mexico, the Establishment Clause of the First Amendment allows the display of a city seal which contains three crosses.  I hold that it does.

## II.    Establishment Clause Jurisprudence.

In 1997, Establishment Clause jurisprudence was considered to be in "hopeless disarray," *Bauchman v. W. High Sch.*, 132 F.3d 542, 551 (10th Cir. 1997), and "the task of parsing the Supreme Court's recent Establishment Clause cases [proved] nothing short of Herculean." *Id.* at 565 (Murphy, J., concurring in part and dissenting in part).  What was true in 1997 is no less true in 2006, particularly in light of the 10 separate opinions authored in *McCreary County v. ACLU of Ky.*, 125 S. Ct. 2722 (2005) and *Van Orden v. Perry*, 125 S. Ct. 2854 (2005).  It is into this murky, turbulent water that this Court must wade.

The Religion Clauses of the First Amendment provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.[2]  The First Amendment "expresses our Nation's fundamental commitment to religious liberty by means of two provisions-one protecting the free exercise of religion, the other barring establishment of religion." *McCreary County*, 125 S. Ct. at 2746 (O'Connor, J., concurring).  With

---

[2] The First Amendment applies to "the States and their political subdivisions" through the Fourteenth Amendment. *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 301 (2000).

the Religion Clauses, the Framers "intended not only to protect the integrity of individual conscience in religious matters, . . . but to guard against the civic divisiveness that follows when the Government weighs in on one side of religious debate[.]" *McCreary County*, 125 S. Ct. at 2742 (Souter, J.) (citing *Wallace v. Jaffree*, 472 U.S. 38, 52-54 and n. 38 (1985)). The First Amendment was "meant to endure, and to meet 'exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur.' " *McCreary County*, 125 S. Ct. at 2744 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819)).

The Founders "were aware that they were designing a government for a pluralistic nation-- a country in which people of different faiths had to live together." Jon Meacham, American Gospel 101 (2006). At that time, the young nation already boasted considerable "religious diversity," with "Congregationalists dominating New England, Anglicans down south, Quakers in Pennsylvania, Catholics huddling together in Maryland, [and] Baptists seeking refuge in Rhode Island." Akil Reed Amar, The Bill of Rights: Creation and Reconstruction 45 (1998).

Indeed, two of the greatest legal minds of our time, Justice Scalia and Justice Stevens espouse nearly polar-opposite views of the Establishment Clause. Their respective positions illuminate the divisiveness that the provision's meaning engenders, and demonstrate the issue's complexity.

Justice Scalia rejects the notion that "[r]eligion is to be strictly excluded from the public forum"; he argues that the Establishment Clause permits state "acknowledgment of a single Creator" - specifically, "the God of monotheism." *See McCreary County*, 125 S. Ct. at 2748, 2753 & n.3 (Scalia, J., dissenting). In support, Justice Scalia cites instances in which early American leaders and official proclamations of the federal government expressed "gratitude to God" in official or public settings. *Id*. at 2748-49, 2754 (noting that these statements and official acts "show *what [the Clause]*

4

*meant*" to those who crafted it). Justice Scalia believes that, because the Framers and young government openly "favor[ed] religion . . . [and] invoked God," it is clear that the Establishment Clause does not proscribe state endorsement of "the God of monotheism." *Id*. at 2753, 2755. The Justice patently rebukes the neutrality principle. *See id*. at 2750-52.

With equal zeal, Justice Stevens maintains that the First Amendment "erect[s] a wall of separation between church and state" and that "government must remain neutral between valid systems of belief." *See Van Orden*, 125 S. Ct. at 2875, 2890 (Stevens, J., dissenting). In marked contrast to Justice Scalia, Justice Stevens believes that "the historical record of the preincorporation Establishment Clause is too indeterminate to serve as an interpretive North Star." *Id*. at 2888 ("the leaders of [the] founding era" held "widely divergent views" of establishment). The Justice posits that interpreting the provision's meaning requires examining "the Clause's text and history [and] the broad principles that remain valid today." *Id*. at 2888. Hence, in Justice Stevens' view, "[t]he evil of discriminating today against atheists, 'polytheists[,] and believers in unconcerned deities,' . . . [is] a direct descendent of the evil of discriminating among Christian sects." *Id*. at 2890.

Justices Scalia's and Stevens' diametrically opposed perspectives on, not only what the Establishment Clause proscribes, but also how to interpret the provision, underscores just how contentious this area of the law remains. Quite plainly, their differing views of history and case law dispel the notion that there are easy answers to be had in Establishment Clause jurisprudence.[3]

---

[3] Historical cherry picking is not helpful; it is divisive. In a recent article, Judge McConnell argues that modern Establishment Clause jurisprudence has failed to comprehensively examine America's experience, pre- and post-founding, with establishment. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003). The meticulously researched piece evidences that the young nation's views of establishment were significantly more nuanced and complex than modern case law - with its frequent ad hoc citation to various Founders' statements and official government actions - suggests. *See id*. at 2115-81 (documenting that a majority of the thirteen colonies had established churches prior to the Revolution, but that establishment took very different forms from colony to colony; *see also id*. at 2182-2205

5

"The First Amendment contains no textual definition of 'establishment', and the term is certainly not self-defining." *McCreary County*, 125 S. Ct. at 2742. Given the competing values underlying the First Amendment and the need to accommodate an evolving society, "an elegant interpretive rule to draw the line in all the multifarious situations is not to be had." *Id.* There is "'no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible.' " *Van Orden*, 125 S. Ct. at 2868 (Breyer, J., concurring in the judgment) (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring)).

When defining the contours of the Religion Clauses, the "touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.' " *McCreary County*, 125 S. Ct. at 2733 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). However, adherence to neutrality must be tempered by a mindfulness of the basic purposes of the Clauses; namely, to " 'assure the fullest possible scope of religious liberty and tolerance for all' . . . [and] to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike." *Van Orden*, 125 S. Ct. at 2868 (Breyer, J., concurring in the judgment) (quoting *Schempp*, 374 U.S. at 305 (Goldberg, J., concurring), and citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 717-29 (2002) (Breyer, J., dissenting)).

"Manifesting a purpose to favor one faith over another, or adherence to religion generally, clashes with the 'understanding, reached . . . after decades of religious war, that liberty and social

_____

(examining the varied rationales for establishment in different colonies, including theological, political, and theoretical justifications).  Scholarship that examines the Clause's origins - in an unbiased and dispassionate way - as Judge McConnell's article does, contributes a great deal to the otherwise rancorous debate.

stability demand a religious tolerance that respects the religious views of all citizens . . . .' "
*McCreary County*, 125 S. Ct. at 2733 (quoting *Zelman v. Simmons-Harris*, 536 U.S. at 718 (Breyer,
J., dissenting)).  "By showing a purpose to favor religion, the government 'sends the . . . message to
. . . nonadherents that they are outsiders, not full members of the political community, and an
accompanying message to adherents that they are insiders, favored members . . . .' "  *McCreary
County*, 125 S. Ct. at 2733 (quoting *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 309-310 and *Lynch v.
Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)).

   Unfortunately, neutrality as the constitutional lynchpin is not free of problems.  *See McCreary
County*, 125 S. Ct. at 2750 (Scalia, J., dissenting) (discussing why neutrality is a "thoroughly
discredited say-so.").  Justice Scalia criticizes the inconsistencies inherent in application of neutrality
and hypothesizes that the Court's "genuine 'good reason' for occasionally ignoring the neutrality
principle . . . is the instinct for self-preservation . . . . the willingness of the people to accept its
interpretation of the Constitution as definitive, in preference to the contrary interpretations of the
democratically elected branches."  *McCreary County*, 125 S. Ct. at 2752 (Scalia, J., dissenting).

   The validity of such criticism is reflected in the current state of our society.  Efforts to avoid
divisiveness and the trend toward neutrality have led to dilution of religious meaning in the United
States.  *See* Patrick M. Garry, *Religious Freedom Deserves More than Neutrality: The Constitutional
Argument for Nonpreferential Favoritism of Religion*, 57 Fla. L. Rev. 1, 6 (2005).  "Formal
neutrality may indirectly impede the exercise of religious liberty . . . . [and] severely undermine[ ] the
theoretical foundation of American religious liberty by subverting the original theology on which it
was grounded."  Daniel O. Conkle, *The Path of American Religious Liberty: from the Original
Theology to Formal Neutrality and an Uncertain Future*, 75 Ind. L. J. 1, 25 (2000).  Strict adherence

to neutrality squelches the idea that religion is "distinct and distinctly important" to our society.  *Id*.

Justice Breyer recognized this flaw when he wrote:

[T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious . . . . [s]uch absolutism is not only inconsistent with our national traditions, . . . but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid.

*Van Orden*, 125 S. Ct. at 2868 (Breyer, J., concurring in the judgment) (internal citations omitted).

Justice Breyer elaborated:

[T]ests designed to measure 'neutrality' alone are insufficient, both because it is sometimes difficult to determine when a legal rule is 'neutral,' and because 'untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious.

*Van Orden*, 125 S. Ct. at 2868-69 (Breyer, J., concurring in the judgment) (quoting *Schempp*, 374 U.S. at 306) (Goldberg, J., concurring)).

Under any theory or application of the First Amendment to a governmental display of a religious symbol, the difficult question is always where to draw the line:  "[T]here is no test-related substitute for the exercise of legal judgment."  *Id*.  Legal judgment "is not a personal judgment."  *Id*. The exercise of such judgment "must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes." *Id*.

At any rate, if anything is clear in Establishment Clause jurisprudence it is this: "Establishment Clause questions are heavily dependent on the specific context and content of the display."  *See O'Connor*, 416 F.3d at 1222 (citing *Van Orden*, 125 S. Ct. at 2869 (Breyer, J., concurring in the judgment)).  The inquiry is, necessarily, "fact- intensive."  *Van Orden*, 125 S. Ct. at 2869 (Breyer,

8

J., concurring in the judgment).  With that in mind, I turn my attention to the facts of this case.

### III.   Context.

#### A.   The Christian Cross.

The Christian or Latin cross is an immediately recognizable symbol for most of Christianity. Although the cross is depicted in many shapes and sizes, the best-known form is the Latin cross, an equal-armed cross with a longer foot.  For Christians, the cross is the most powerful symbol of their faith - the symbolic representation of redemption and of the atoning death of Jesus Christ.  For others, the cross has been, historically, a powerful symbol as well; sadly and too often it has been a symbol of oppression, persecution, and sometimes death.

On Christmas Day 800, Charlemagne was crowned by Pope Leo III as "the great and peace-bringing Emperor of the Romans."  Thomas Bokenkotter, *A Concise History of the Catholic Church* 97 (1990).  In a startling example of differing perspectives, Charlemagne was also known as the "butcher of the Saxons." Derek Wilson, *Charlemagne* 199 (2006).  In retaliation for resistance to Christianization, Charlemagne had 4,500 men beheaded in one day.  Wilson at 46-47.

The Crusades (1095-1272) are viewed, by Christians, as noble, inspired efforts to retake the Holy Land.  Bokenkotter at 138.  Muslims and Jews, on the other hand, view the Crusades as cruel and savage.  *Id*. at 139.

During the period of the Spanish Inquisition, Jews were forced to convert to Christianity. James Reston, Jr., *Dogs of God: Columbus, the Inquisition, and the Defeat of the Moors*, 260-61 (1990).  Refusal to convert could result in expulsion, imprisonment, or death.  *Id*.  Synagogues were turned over to the royal treasury or converted to Christian Churches.  *Id*.  Over 120,000 Jews were expelled from Spain in 1492, a region where they had lived and prospered for over 800 years.  *Id*.

Variants of the cross were prominent symbols in Nazi Germany. While the swastika was the most notorious example, Nazi military decorations included the Iron Cross, the Knight's Cross, and the Grand Cross. Gordon Williamson, *The Iron Cross: A History* 1813-1957, 65-66 (1990). Millions suffered through one of mankind's darkest hours, at the hands of those proudly wearing crosses.

### B.    The Significance of Three Crosses.

The New Testament describes the crucifixion of Jesus. The gospels of Matthew, Mark, and Luke indicate that the Romans crucified two criminals along with Jesus at Calvary, one on His right side, and the other on the left. *Matthew* 27:38; *Mark* 15:27; *Luke* 23:32-33. From these passages, the "three crosses"--one Latin cross, slightly taller than the crosses to the right and left of it--have come to symbolize the crucifixion of Jesus and the two criminals.

### C.    Brief History of Las Cruces.

Las Cruces is New Mexico's second-largest city. It is located in the Rio Grande Valley, forty miles north of El Paso, Texas and Ciudad Juarez, Chihuahua, Mexico, and about 300 miles south of Santa Fe, New Mexico. Founded as a village in 1849, Las Cruces incorporated as a town in 1907, and reincorporated as a city in 1946. (Hunner[4] Report at 6.)

Native Americans occupied the region before the 16th century. Warren A. Beck, *New Mexico, A History of Four Centuries* 23 (6th ed. 1975). From 1527 to 1537, Alvar Nunez Cabeza

---

[4] Jon Hunner, Ph.D, Associate Professor and Director of the Public History Program at New Mexico State University, was appointed to serve as an expert witness on the history of Las Cruces, including the historical context of the name, "Las Cruces," and the use of crosses within the community of Las Cruces. (Doc. 55.) *See* Fed. R. Evid. 706. On September 11, 2006, I ruled that Dr. Hunner was qualified to testify as an expert witness on the history of Las Cruces, including the historical context of the name, "Las Cruces," and the use of crosses within the community of Las Cruces, but granted Plaintiffs' Motion to Strike with respect to Section Two of the of the Hunner Report, entitled "Governmental Protection of the Practice of Religion," the second and third paragraphs on page 19, continuing to page 20, and any other legal opinions rendered by Dr. Hunner. (Doc. 157.)

de Vaca, Alonso del Castillo Maldonando, Andrés Dorantes de Carranca, and the Moor Estevan wandered the Southwest after they were marooned near present-day Galveston, Texas. (Hunner Report at 3.) At least six Spanish expeditions followed, propelled by the myth of the Seven Cities of Cibola. Marc Simmons, *New Mexico, An Interpretive History* 13-14, 35 (Univ. of N.M. Press 1988). None of the members of the early expeditions stayed and settled in the area. *Id.* at 35.

In 1598, Don Juan de Oñate and a group of settlers traveled north from New Spain, and formally declared possession of Nuevo México when they crossed the Rio Grande near present-day El Paso. Beck, *supra,* at 53; Simmons, *supra*, at 35. As he continued north along the Rio Grande Valley through present-day New Mexico, Oñate extended the trail known as "El Camino Real de Tierra Adentro," ("Camino Real") which translates as "The Royal Road to the Interior Lands." (Hunner Report at 3-4.) Although the Camino Real passed through the site that would become Las Cruces, permanent settlement of the area was delayed due to lack of reliable water and Native American raids. (*Id.*) Oñate continued north of present-day Santa Fe, and established the capital of the province at Ohkay Ohwingeh (formerly San Juan Pueblo). Gordon Owen, *Las Cruces New Mexico 1849-1999: Multicultural Crossroads* (1999); www.gov.state.nm.us/press/2005/dec/121605 _01.pdf.

Except for the Pueblo Revolt (1680-1692) and the Reconquest (1693-1700), the Spanish ruled Nuevo México until 1821,when Mexico achieved independence from Spain. Owen, *supra*, 15-18. After the Santa Fe Trail opened in 1821, the Camino Real became known as the Chihuahua Trail. (Hunner Report at 4.)

In 1848, through the Treaty of Guadalupe-Hildalgo, Mexico ceded Nuevo México, and much of the present-day Southwest, to the United States. (Hunner Report at 14-15); Owen at 25. In 1849,

Pablo Melendres, the mayordomo of Doña Ana, a village about fifteen miles to the north of present-day Las Cruces, asked the United States Army to help relieve overcrowding in his community. (Hunner Report at 4.)  Lt. Delos Sackett used a rawhide rope to lay out a grid of streets and founded *El Pueblo del Jardin de Las Cruces*, which translates as "the City of the Garden of the Crosses." (*Id*.)

> **D.**     **Origin of the Name "Las Cruces."**

"Las Cruces" is Spanish for "the crosses."  Plaintiffs are not willing to concede this translation and suggest that the term "Las Cruces" can also be translated "the crossings."  While some historians have noted this possible ambiguity, Owen, *supra*, at 31, and it is true that the plural of both *cruz* (cross) and *cruce* (crossing) is *cruces*, the potential for confusion dissipates when the gender of the respective nouns is considered.  All nouns in Spanish have either masculine or feminine gender, except for one or two nouns of undecided gender.  John Butt & Carmen Benjamin, *A New Reference Grammar of Modern Spanish* 1 (3d ed. 2000).

*Cruz* is a feminine noun, *Concise Oxford Spanish Dictionary* 175 (2d ed. 1998), the plural of which, accompanied by its definite article (which must agree in case and gender with the noun modified) is rendered *las cruces*, while *cruce* is a masculine noun, *id*., the plural of which, accompanied by its definite article, is rendered *los cruces*.  Indeed, if the village had been named for crossroads or crossings, it would have been named *Los Cruces*, and not *Las Cruces*.

Notwithstanding basic linguistics and adding to the uncertainty, one theory on the origin of the name holds that the name "Las Cruces" originated from the intersection of the Chihuahua Trail and the Butterfield Overland Mail Route near Las Cruces.  (Hunner Report at 4.)  However, this theory lacks historical, as well as linguistic, support.  (*Id*.)  The Butterfield Overland Mail Route

began service through the area in the 1850s.  (*Id*.)  In that the Butterfield Trail passed through the area only after the village of *El Pueblo del Jardin de Las Cruces* was founded, the "the crossroads" translation likely would not have been the source of the name "Las Cruces." (*Id*.; Hunner Depo. at 84-85.)

The more reliable, and widely held, theory holds that the name, Las Cruces, described groups of crosses placed on graves and the sites of massacres that occurred in the area between 1712 and 1840.  (Hunner Report at 4.)  Indeed, this origin is recounted in a brochure published by the City entitled "History of the Crosses: How Las Cruces Got Its Name."  (Pls.' Exs. 1 and 2, Affs. of Weinbaum and Boyd, Ex. 28.)

Several massacres occurred along the Camino Real/Chihuahua Trail near present-day Las Cruces.  (Hunner Report at 4.)  In 1712, a group of colonists traveling north to Santa Fe were attacked by Apaches at their campsite about thirty to forty-five miles north of Paso del Norte (present-day Ciudad Juarez).  (*Id*.)  Soldiers from Paso del Norte buried the victims and erected crosses over the graves.  (*Id*.)

In 1787, a bishop, a priest, two military officers, four trappers, and four choir boys were killed at the site.  (Hunner Report at 4.)  According to Owen, the attack occurred near the Rio Grande and only one boy survived.  Owen, *supra*, at 30.  In a report dating from 1830, a caravan of forty people traveling south from Taos were all killed in the area, resulting in a "forest of crosses." (*Id*.); Owen, *supra*, at 31.  Another theory held that the brush along the river provided such fine cover for the Apaches that there were several small clusters of crosses, each marking a massacre, scattered around the river bank.  Owen, *supra*, at 31.

On February 12, 1847, an eyewitness recorded the following observation in her diary:

13

> Yesterday, we passed over the spot where a few years since a party of Apaches attacked Gen. Armijo as he returned from the Pass with a party of troops, and killed some fourteen of his men, the graves of whom, marked by a rude cross, are now seen.

(Hunner Report at 4-5 (quoting Susan Shelby Magoffin, *Down the Santa Fe Trail and Into Mexico* 203 (Univ. of Nebraska Press, 1982)).)  The village of *El Pueblo del Jardin de Las Cruces*[5] was founded two years after the diary entry.  This first-hand report is the most compelling evidence of crosses standing in the area that would, shortly, become Las Cruces.

During the Spanish colonial and Mexican periods, most travelers and settlers in the area were Catholic and crosses were used to mark graves or locations of massacres.  (Hunner Report at 5.)  The practice of marking graves and the sites of tragedies with crosses remains a common practice in New Mexico to this day.  (*Id.*)  The accounts of massacres in the area support the premise that multiple crosses marked the site in 1849, when the village was founded and named.  (*Id.*)  While there may be some confusion regarding the origin of the name, there is no dispute of material fact that the name Las Cruces, means "The Crosses."

### E.    Crosses Used as Official Symbols of the Municipality of Las Cruces.

The earliest documented use of three crosses in an official symbol of Las Cruces consists of a lease agreement between the Town of Las Cruces and Mrs. A.L. Sweet, dated July 28, 1941.  (Hunner Report, Ex. 1.)  The Town's letterhead contained a grouping of three crosses, the one in the middle larger and higher than the others, with the motto, "The City of the Crosses."  (*Id.*)

Before 1946, the Town's seal was a bunch of grapes.  (Hunner Report, Ex. 2.)  On April 16, 1946, the same year that Las Cruces incorporated as a City, the local newspaper reported:

---

[5] Spanish speakers will recognize that "*jardin de las cruces*," garden of the crosses, may well be a euphemism for a cemetery, lending further support for the notion that the name, *Las Cruces*, means "the crosses."

"At [Mayor Sam] Klein's request, the council-elect also gave [City Clerk] Mrs. Jackson authority to order a new seal of the city of Las Cruces to replace the old town seal which consists of a bunch of grapes.  The new seal designed by [City Attorney E.G.] Shannon will now show three crosses."

(Hunner Report, Ex. 4.)  The City seal has contained three crosses to this day.  (Hunner Report, Ex. 3.)  Mayor Sam Klein was Jewish.  (Hunner Depo. at 94.); Henry J. Tobias, *Jews in New Mexico*, (1990).

Las Cruces celebrated its centennial in October 1949.  (Hunner Report, Ex. 5.)  The cover of a publication concerning the centennial included three crosses hovering over a depiction of the city skyline against the backdrop of the Organ Mountains.  (*Id.*)  The cover also included a flying missile, Tortugas Peak, a plowed field, a conquistador carrying a flag, three friars bearing a cross, a Native American on horseback brandishing a rifle, a farmer wielding a hoe, and a graduate holding a diploma. (*Id.*)

In the 1950s, three interlocking crosses emblazoned the sides of Las Cruces police cars. (Hunner Report, Ex. 6.)  The cover of the City's 1963-64 Annual Report included several images illustrating city services and a symbol consisting of three crosses surrounded by a sunburst.  (Hunner Report, Ex. 8.)  The center cross was slightly taller than the others.  (*Id.*)  The cover of the 1965 Annual Report employed a slightly different version of the three-crosses-in-a-sunburst symbol. (Hunner Report, Ex. 9.)  The version on the 1965 Annual Report is very similar to the symbol currently used by the Las Cruces Public Schools on maintenance vehicles.  (Hunner Report, Exs.  9 and 10.)

As of 1969, three crosses, with the center cross larger and higher than the others, adorned the outside of city hall.  (Hunner Report, Ex. 7.)  Subdivision maps dating from 1972 and 1986 display

the three-crosses-in-a-sunburst motif rising over the Organ Mountains.  (Hunner Report, Ex. 11.)

Raymond Garcia, a lieutenant with the Las Cruces Fire Department, previously worked as a purchasing clerk for the City.  (Hunner Report at 9.)  Mr. Garcia recalls that, in 1974, Ray Escalante, Director of Facilities for the City during the early 1970s, asked Mr. Garcia to update a metal sculpture hanging in City Hall.  (Hunner Report at 9.)  The old sculpture depicted three crosses, a yucca plant, a roadrunner, and the Organ Mountains.  (*Id.*)  In redesigning the sculpture, Mr. Garcia re-used the three crosses, and added a flaming circle as a tribute to the Johnny Cash song "Ring of Fire."  (*Id.*)  Mr. Garcia describes himself as a former "long-haired, no-religion, Black Sabbath music lover" and insists that he had absolutely no intention to endorse religion when he redesigned the sculpture.  (*Id.*)

Bobby De La Rosa, who was employed in the City's drafting department in the early 1970s, designed a symbol of three crosses encased in a Zia symbol that is used on the sides of Las Cruces police cars.  (Hunner Report at 8.)

**F.     Design of the Symbol.**

The Symbol appeared on city letterhead as early as January 16, 1975.  (Hunner Report, Ex. 12.)  It was created sometime in the early 1970s.  (Hunner Report at 8.)  According to Mr. De La Rosa, the Symbol "just evolved" from the three-crosses-in-a-sunburst design.  (*Id.*)  Mr. Escalante recalls that he was asked to oversee the creation of a new design for the City's symbol.  (*Id.*)  After winning an in-house design competition, Mr. De La Rosa created the Symbol.  (*Id.*)  According to Mr. De La Rosa: "At no time did religion enter into the concept of the logo . . . . [t]here was never any discussion of religion at all."  (*Id.*)

Art Robertson, retired Director of Personnel for the City, remembers that Donald Davidson,

16

a representative of an El Paso advertising agency, presented the Symbol to the City Council at a work session in 1974 or 1975.  (Hunner Report at 8.)  Mr. Robertson recalled that the City Council voted to adopt and copyright the Symbol.  (*Id.*)

Dr. Hunner uncovered no indication that the City contemplated a religious meaning with respect to use of the Symbol in particular or three crosses in general.  (Hunner Depo. at 94.)  Other than the use of crosses in the Symbol, the record contains no evidence that the City acted with a religious purpose when it created, adopted, or used the Symbol.  Although the events surrounding the design of the Symbol are uncertain, there is no material fact in dispute concerning the absence of religious purpose in the design of the Symbol.

### G.     The City's Use of the Symbol

The City displays the Symbol on public monuments, signs, flags, city council chambers, the library, parks, official uniforms, and official vehicles.  (Hunner Depo. 9-16, Pl.  Exs.  1 & 2, Weinbaum and Boyd Affs., Exs. 1, 4, 5-15, 17 and 18.)  The City uses the Symbol on television broadcasts and public documents, including letterhead, envelopes, official documents, notices, maps, brochures, and advertisements.  (Hunner Depo. 11,Weinbaum and Boyd Affs., Exs. 19-27 and 28.)  When used on some City vehicles, the Symbol is accompanied by the words "FOR OFFICIAL USE ONLY."  (Weinbaum and Boyd Affs., Exs 17 & 18.)  When used on some City publications, notices and advertisements, the Symbol is accompanied by the words "PEOPLE HELPING PEOPLE." (Weinbaum and Boyd Affs. Exs. 21-24; 25-26; 28.)  The City has published a brochure, entitled "History of the Crosses: How Las Cruces Got Its Name," that describes the secular origins of the name.  (Weinbaum and Boyd Affs., Ex. 28.)

City Police Officers wear a patch that includes a slightly modified Symbol; the entire patch

is 4.5 inches high and the crosses on the patch are less than .5 inch high.  (Mem. in Support of Defs.' Mot. for Summ. J. at 14.)  A modified version of the Symbol appears on the side of City police cars; the crosses in the version on the police cars are two inches high.  (*Id.*)  At all times, the City has paid for the development, application and display of the Symbol and modified Symbols (collectively "Symbol") with public funds.  (Mem. in Support of Defs.' Mot. for Summ. J. at 15.)

### H.     Crosses used to identify non-religious entities in Las Cruces.

The Las Cruces Chamber of Commerce has used three crosses as a symbol since 1970, (Hunner Report Ex. 14), and currently includes three crosses in its logo.  *See* http://www. lascruces.org/.  A number of businesses in Las Cruces use three crosses to identify themselves as local enterprises.  (Def. Exs. C, D, E, F, G, H, and I.)

As early as 1919, the annual yearbook at Las Cruces High School was called "The Crosses." (Hunner Report at 10; Ex. 13.)  The Las Cruces Public School District uses a symbol with three crosses to identify its maintenance vehicles.  (Hunner Report, Ex. 10.)  A sculpture containing three stylized crosses is displayed at the entrance of the Las Cruces Public School District's Regional Sports Complex.  *See* http://www.lcps.k12.nm.us/Departments/Athletics/field.shtml.

## IV.     Summary Judgment Standard.

Summary judgment should be granted if the record shows " 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' "  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  In applying this standard, a court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Id.* (internal quotation marks and citation omitted).

The moving party bears "the initial burden to show that there is an absence of evidence to support the nonmoving party's case." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks and citations omitted).  If the moving party satisfies this burden, the other party must "identify specific facts that show the existence of a genuine issue of material fact."  *See id.* ("party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.").

"A fact is material if under the relevant substantive law it is essential to proper disposition of the claim."  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005) (internal quotation marks and citation omitted).  An otherwise well-taken summary judgment motion is not, however, defeated by the "mere existence of *some* alleged factual dispute between the parties . . . the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## V.   *Lemon* and its Limits.

The "traditional standard" for Establishment Clause analysis is the three-part test articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1258-59 (10th Cir. 2005) (internal quotation marks and citations omitted).  The *Lemon* test provides that " 'government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement.' "  *O'Connor v. Washburn Univ.*, 416 F.3d at 1224 (quoting *Bauchman*, 132 F.3d at 551).

Application of the *Lemon* test has proven contentious.  *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 399 (1993) (Scalia, J., concurring).  Justice Scalia has lamented

that selective application of *Lemon* spawned a "strange Establishment Clause geometry of crooked lines and wavering shapes." *Lamb's Chapel*, 508 U.S at 399 (Scalia, J., concurring in the judgment). "Acknowledging *Lemon*'s weaknesses," Justice O'Connor crafted a concurring opinion in *Lynch v. Donnelly*, that encouraged the Court "to refine the *Lemon* analysis to focus more on whether government is 'endorsing' religion." *Bauchman*, 132 F.3d at 551 (citing *Lynch v. Donnelly*, 465 U.S. 668, 687-94 (1984)). Justice O'Connor's concurrence provided a sound analytical framework for evaluating governmental use of religious symbols. *See O'Connor*, 416 F.3d at 1224; *e.g.*, *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 595 (1989) (holiday display featuring crèche and Chanukah menorah).

Under Justice O'Connor's "endorsement test," the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that "religion or a particular religious belief is favored or preferred." *County of Allegheny*, 492 U.S. at 590. Both the purpose and effect prongs are analyzed through the eyes of an "objective observer." *McCreary County*, 125 S. Ct. at 2734; *see also O'Connor*, 416 F.3d at 1228. An objective observer "takes account of the traditional external signs that show up in the 'text, legislative history, and implementation . . .' of the official act." *McCreary County*, 125 S. Ct. at 2734 (quoting *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308). The objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *McCreary County*, 125 S. Ct. at 2737 (citing *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308).

The plurality opinion in *Van Orden* upheld a Ten Commandments display without a discussion of the *Lemon* factors or the endorsement test. *Van Orden*, 125 S. Ct. at 2861-64 (Rehnquist, C.J.). However, until the Court overrules *Lemon*, it remains binding precedent. *O'Connor*, 416 F.3d at

1224. The Tenth Circuit continues to apply the *Lemon* factors, as modified by the endorsement test, while remaining mindful of the teachings of *McCreary County* and *Van Orden*. *Id*.

**VI.   Application of *Lemon*, modified by the endorsement test, tempered by *McCreary County* and *Van Orden*, to the City's adoption and use of the Symbol.**

The religious significance of the cross is undeniable. *See Friedman v. Bd. of County Comm'rs of Bernalillo County*, 781 F.2d 777, 782 (10th Cir. 1985) (observing that "any statement to the contrary would be disingenuous"). The cross represents the central tenant of Christianity and is held sacred by Christians the world over. At the same time, the cross holds negative connotations for many members of our community. *See Friedman*, 781 F.2d at 782. In that the Symbol contains three recognizable, albeit stylized, Latin crosses, the Symbol bears religious significance and holds the potential for divisiveness.

Religious significance does not necessarily render the City's use of the Symbol unconstitutional. "Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Van Orden*, 125 S. Ct. at 2863. The defining question is whether the City's use of the Symbol manifests "the ostensible and predominate purpose of advancing religion" or "favor[ing] one faith over another," *McCreary County*, 125 S. Ct. at 2733, and whether it has the effect of conveying a message that religion or a particular religious belief is favored or preferred. *O'Connor*, 416 F.3d at 1224.

**A.   Purpose.**

There is no direct evidence of the City's purpose in using three crosses in its seal. The only available evidence is the newspaper report concerning Mayor Klein's request to adopt the seal upon reincorporation in 1946. The available evidence concerning the design of the Symbol in the early

1970s indicates a secular purpose of identifying the City.

When there is no evidence of the original purpose for adopting a practice, the government may propose possible secular justifications for the challenged practice. *King v. Richmond Co.*, 331 F.3d 1271, 1277 (11th Cir. 2003).  While the government "has the obligation to propose a secular justification for the challenged practice . . . [t]his does not mean . . . that the government fails the purpose prong in cases in which there is no available evidence of the original intent for adopting a practice." *Id*.

The City has identified three secular purposes served by the Symbol: (1) identifying city activities and property; (2) promoting the City's unique history; and (3) linking the City to its origin. The present City Council has disavowed any religious purpose in connection with the Symbol. (Defs.' Ex. L.)  The record contains no indication that the City acted with a religious purpose in adopting and using the Symbol.

A professed secular purpose is entitled to some deference. *McCreary County*, 125 S. Ct. at 2735.  However, that purpose "has to be genuine, not a sham, and not merely secondary to a religious objective." *Id*.  The court has a duty to " 'distinguis[h] a sham secular purpose from a sincere one.'" *Id*. (quoting *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308).  Once the government proposes a possible secular purpose for the challenged practice, the party challenging the practice has the opportunity to rebut the stated secular purpose with evidence showing that the articulated purpose is insincere or a sham. *King*, 331 F.3d at 1277 (citing *Edwards v. Aguillard*, 482 U.S. 578, 587 (1987)).  The City has articulated a plausible secular purpose for the design of the Symbol.  Plaintiffs have presented no evidence that the stated secular purposes are insincere or a sham, or that there was any religious purpose connected to the adoption of three crosses to identify the City or the design or use of the

Symbol.

Plaintiffs argue that this case is controlled by *Robinson v. City of Edmond*, 68 F.3d 1226 (10th Cir. 1995), and *Friedman*, 781 F.2d at 777. In those cases, the issue presented was whether a "government seal or logo containing an unmistakably religious image violates the Establishment Clause." *E.g.*, *Robinson*, 68 F.3d at 1228 ("The circular seal contains four quadrants, of which [three depict secular symbols] . . . and the last quadrant depicts a Christian cross."); *Friedman*, 781 F.2d at 779 & n.1 ("The circular seal . . . contains the phrases, 'Bernalillo County,' and 'State of New Mexico' . . . [and] the Spanish motto, 'CON ESTA VENCEMOS,' which translates into English as, 'With This We Conquer,' or 'With This We Overcome,' [that] arches over a golden latin [sic] cross, highlighted . . . . The cross occupies roughly half the seal . . . ."). In each case, the defendants' arguments that the cross simply represented the communities' Christian heritage or history were squarely rejected. *E.g.*, *Robinson*, 68 F.3d at 1232 (rejecting defendants' argument that "the City seal is permissible because it symbolizes "the unique history and heritage of Edmond"); *Friedman*, 781 F.2d at 779, 782 (reversing district court's finding "that the significance of the sheep and cross was solely historical").

The Court finds these cases readily distinguishable from the case at bar. Las Cruces' name, quite simply, sets this case apart from those cited by Plaintiffs. A reasonable observer of the Symbol would understand that the crosses represent, symbolically, this uniquely named geopolitical subdivision, rather than an endorsement of Christianity. *Cf. Robinson*, 68 F.3d at 1227 (challenge to City of Edmond, Oklahoma's official seal); *Friedman*, 781 F.3d at 779 (challenge to Bernalillo County, New Mexico's official seal). In that the actual name of the City is symbolically represented by the crosses, this case is more analogous to *Murray v. City of Austin*, 947 F.2d 147 (5th Cir.1991).

23

In *Murray*, the Court of Appeals for the Fifth Circuit found the City of Austin, Texas's official logo to be constitutional, notwithstanding its inclusion of a Latin cross. *Id*. at 149. The *Murray* court's decision turned on the fact that the Austin logo was modeled after "the family coat of arms of Stephen F. Austin, the 'father of Texas' and the person after whom the City is named." *Id*. Austin's familial coat of arms contained a Latin cross. *Id*. In holding that the logo did not have the effect of endorsing religion, the Fifth Circuit found that "the insignia has the principal or primary effect of identifying city activity and property and promoting Austin's unique role and history." *Id*. at 155.

As in *Murray* - where the "connection between the state of Texas, the city of Austin, and Stephen F. Austin is unparalleled" - the connection between Las Cruces and three crosses is "unparalleled." *See Webb v. City of Republic*, 55 F. Supp. 2d 994, 1000 (W.D. Mo. 1999); *accord Robinson*, 68 F.3d at 1232 & n.10 (discussing *Murray*). Additionally, the different outcomes in *Murray*, versus *Robinson* and *Friedman*, further underscore that "factual specifics and context are nearly everything when it comes to applying the Establishment Clause to religious symbols and displays." *Glassroth v. Moore*, 335 F.3d 1282, 1300 (11th Cir. 2003).

In this case, as in *Murray*, the choice of a symbol or seal to represent the City of Austin or the City of Las Cruces was driven by the name of the city. No further deliberation would have been required nor implied in choosing the Symbol, which literally reflects the name. In *Robinson* and *Friedman*, however, the local governing bodies necessarily made their own choices, unrelated to the name of the entity itself, as to what symbols (or seals) would represent the city or county. In making those decisions, in exercising that discretion, the governing bodies revealed attitudes and beliefs, which impermissibly crossed the establishment line.

24

The secular purposes identified by the City are, absent any evidence to the contrary, sufficiently sincere to pass constitutional muster.  The City adopted a seal containing three crosses at the behest of Mayor Klein, who was Jewish.  The seal was designed by the City Attorney, E.G. Shannon.  Although the exact circumstances surrounding the adoption of the Symbol are unclear, none of the putative designers of the Symbol was motivated by a religious purpose.  There is no evidence that the Symbol is now, or was ever, associated with a religious purpose.

The Court has held government action unconstitutional where "openly available data supported a commonsense conclusion that a religious objective permeated the government's action." *McCreary County*, 125 S. Ct. at 2735.  No evidence of record links the adoption or use of the Symbol with a religious purpose.  The objective observer is deemed to be familiar with the history of the government's actions and competent to understand what history has to show.  The Symbol has no objectively available history of manifesting a religious purpose.  An objective observer, "aware of the history and context of the community and forum" in which the Symbol appears, *McCreary*, 125 S. Ct. at 2737 (quoting *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment), would not believe that the City acted with an ostensible and predominate purpose of advancing religion, generally, or Christianity in particular, in adopting and using the Symbol.

**B.     Effect.**

"The 'effect' prong of the endorsement test asks whether a reasonable observer aware of the history and context of the forum would find the display had the effect of favoring or disfavoring a certain religion." *O'Connor*, 416 F.2d at 1228.  The question of whether the display conveys a message endorsing religion depends on how the display is used. *Id*.  Context is crucial. *Van Orden*,

25

125 S. Ct. at 2869 (Breyer, J., concurring in the judgment).  The Establishment Clause prohibits only those government activities which, in the eyes of a reasonable observer, advance or promote religion or a particular religious belief.  *Bauchman v. W. High Sch.*, 132 F.3d at 554.  "This is an objective inquiry, not an inquiry into whether particular individuals might be offended. . . ."  *Id.*

The City uses the Symbol to identify City activity and property.  In this context, the Symbol communicates the secular message that the City's name means "The Crosses" and links the City to its historic roots.  This information is available to an objective observer through the brochure published by the City.  *See O'Connor*, 416 F.3d at 1228 (observing an objective observer would review brochure describing display).  Indeed, many nonreligious businesses in the Las Cruces area use three crosses to identify themselves as local firms.  While the Court does not "count heads before enforcing the First Amendment," *McCreary County*, 125 S. Ct. at 2747 (O'Connor, J., concurring), the use of the crosses to identify local business supports the concept that three crosses are colloquially associated with Las Cruces.  (Defs.' Ex. L.)  The circumstances surrounding the adoption and use of the Symbol suggest that the City did not intend to send a religious message through the Symbol.

The City has used three crosses to identify itself since the 1940s and has used the Symbol since the 1970s.  The passage of time is relevant to the Establishment Clause analysis.  *See Van Orden*, 125 S. Ct. at 2858.  "[A]n unbroken practice . . . is not something to be lightly cast aside."  *Marsh v. Chambers*, 463 U.S. 783, 790 (1983).  The fact that the City has used the Symbol for more than three decades, combined with the lack of any evidence of an intent to proselytize, is significant in concluding that the adoption and use of the symbol does not have the effect of endorsing religion in general or Christianity in particular.

Plaintiffs contend that the use of the words "for official use only" in conjunction with the

Symbol establishes the City's endorsement of religion.  (Pls.' Mem. in Support of Mot. for Summ. J. at 7.)  With respect to the photograph of the City Dial-A-Ride van, the words "FOR OFFICIAL USE ONLY" obviously refer to the use of the vehicle, not the use of the Symbol.  (Pls.' Exs. 1 and 2, Weinbaum and Boyd Affs., Ex. 17-18.)  The other photographs in the record with the words "FOR OFFICIAL USE ONLY" depict a seal used by Las Cruces Public School District, a separate entity from the City.  (Pls.' Exs. 1 and 2, Weinbaum and Boyd Affs., Exs. 3 and 16.)  Thus, they are not relevant to the analysis herein.

An objective observer would be aware of the origin of the City's name, the historical context in which the name arose, and the City's decades-long use of crosses to identify itself.  Viewed in this context, the adoption and use of the Symbol does not have the effect of favoring or disfavoring religion in general or Christianity in particular.

### C.    Entanglement.

The entanglement analysis typically is applied to circumstances where the government involves itself with a recognized religious activity or institution. *Bauchman*, 132 F.3d at 556.  Here, Plaintiffs do not allege that the City has involved itself in a recognized religious activity or institution. However, the parties argued entanglement in their briefs, so the issue will be addressed.

"Entanglement is a question of kind and degree. " *Lynch v. Donnelly*, 465 U.S. at 684.  The First Amendment does not prohibit all interaction between church and state; entanglement of the two becomes constitutionally "excessive" only when it has "the effect of advancing or inhibiting religion." *Skoros v. City of New York*, 437 F.3d 1, 36 (1st Cir. 2006) (quoting *Agostini v. Felton*, 521 U.S. 203, 232-33 (1997)).  The entanglement analysis is properly treated as an aspect of the inquiry into effect. *Skoros*, 437 F.3d at 36.

With respect to the use of the Symbol, the City does not provide any benefit or financial support to a religious institution or afford a religious institution a role in defining legal standards or obligations.  There is no evidence that the City sponsors any religious activity through the use of the Symbol.  The fact that the City uses public funds to apply the Symbol to public property does not equate to entanglement in light of the secular purposes surrounding the use of the Symbol. The City's use of the Symbol does not constitute excessive entanglement because it does not have the effect of advancing or prohibiting religion.

**VII.    Conclusion.**

The adoption and use of the Symbol by the City does not violate the Establishment Clause of the First Amendment.

 The constitutional issues raised in this case are "issues of acute public interest-issues which evoke diverse opinions and strong emotions." *Bauchman*, 132 F.2d at 545.  All the more so in this divisive context, "[w]e take seriously our obligation to uphold the First Amendment of the Constitution, which fundamentally operates to protect minority interests." *Id*.

The issues raised by Plaintiffs are some of the most divisive of this, or any, time.  The Court is also mindful that a suit of this nature "puts nothing in a plaintiff's pocket and can take a great deal out, and . . . the risk of social ostracism can be powerfully deterrent." *Van Orden*, 125 S. Ct. 2897 (Souter, J., dissenting).

In the Las Cruces newspapers during the pendency of this litigation, Plaintiffs have been the subject of several letters to the editor and comments in the "Sound Off" column.  Many of those letters and comments have gone beyond critical to downright mean.  People have suggested that if Plaintiffs have these complaints about the community, they should leave.  No, they should not.  This

is the United States of America.  As concerned citizens and parents, Plaintiffs have every right to raise their concerns in this court.

The beauty of the system of governance passed down by the Founders is that Plaintiffs do not have to leave, that the complaint of those in the minority can and should be heard, and that we are all better for the hearing.  In the hearing, we grow as a people and as a Nation.  We can and should develop a deeper appreciation for our diversity.  We can come to understand that one man's symbol of hope and resurrection power may be, to another, something else entirely.  We can be awakened to the notion that the respect and dignity we owe each of our neighbors should not depend on a conforming belief system.

Before leaving the Supreme Court, Justice O'Connor challenged us all with the following:

> [T]he goal of the Clauses is clear: to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society. By enforcing the Clauses, we have kept religion a matter for the individual conscience, not for the prosecutor or bureaucrat. At a time when we see around the world the violent consequences of the assumption of religious authority by government, Americans may count themselves fortunate . . . . Those who would renegotiate the boundaries between church and state must therefore answer a difficult question: Why would we trade a system that has served us so well for one that has served others so poorly?

*McCreary County*, 125 S. Ct. at 2746 (2005) (O'Connor, J., concurring).

Mr. Weinbaum, a man of conviction, brought this suit on behalf of himself and his daughter, Olivia, a bright and beautiful child who attends a local school.  In bringing this suit, Mr. Weinbaum, must have hoped to make his community, her community, a better place.  Sadly, it has come to the Court's attention that the opposite has occurred; that Olivia has been made to suffer for the position her father has taken.  If that is true or, if, as a result of this decision it comes true, then shame on us all.

WHEREFORE,

IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. 140), filed on June 29, 2006, is GRANTED, and Plaintiffs' Motion for Summary Judgment (Doc. 142), filed on June 29, 2006, is DENIED.

IT IS ORDERED that judgment in favor of Defendants shall issue forthwith.


_____
ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE